[Cite as *State v. Ferguson*, 2014-Ohio-3153.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 13AP-891 |
| v. | : | (C.P.C. No. 12CR-05-2699) |
| Kevin Ferguson, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on July 17, 2014

*Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee.

*Yeura R. Venters*, Public Defender, and *John W. Keeling*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

SADLER, P.J.

{¶ 1} Defendant-appellant, Kevin Ferguson, appeals from the judgment of the Franklin County Court of Common Pleas convicting him of one count of trafficking in cocaine, a first-degree felony, in violation of R.C. 2925.03. For the reasons that follow, the judgment of the trial court is affirmed in part and reversed in part.

## I. BACKGROUND

{¶ 2} On May 30, 2012, appellant was indicted for one count of trafficking in cocaine. The charge arose out of an incident that occurred on August 23, 2011, and during appellant's jury trial, the following evidence was adduced.

{¶ 3}   Corporal Nathanael Smith of the Franklin County Sheriff's Department testified that, while working as a detective in the special investigations unit, he received information from an informant that appellant and appellant's brother, Theo Ferguson, were dealing narcotics.  During his investigation, Corporal Smith was introduced to and made a series of undercover drug purchases from Theo.  The circumstances surrounding appellant's charge arose on August 23, 2011, at which time Corporal Smith went to Theo's apartment where he "was to purchase an ounce of crack cocaine from Theo."  (Tr. 14.) Corporal Smith testified that when he arrived at Theo's, he was told if the supplier was not there in ten minutes, they would have to go to another location to meet the supplier. When the supplier did not arrive, Corporal Smith and Theo drove to meet him at a pizza place on Lockbourne Road.  According to Smith:

> On the way over, Theo Ferguson was telling me that he would go in, order a whole pizza for 1150, which in their code meant an ounce of crack cocaine for $1,150.  When we arrived at the parking lot of the business, I gave -- I'm sorry.  I gave Theo Ferguson $1,150.  He went inside, left me in the car, and came back about 5 minutes later and said everything is good, but it's going to be 10, 15 minutes.  We drove up to a gas station to then kill some time and wait for it to be ready.

(Tr. 16.)

{¶ 4}   Once at the gas station, Corporal Smith testified as follows:

> We go in to get something to drink, and Theo Ferguson came out on the phone, and he acted really upset.  He was kind of arguing, but not really bad, but seemed upset on the phone, and hung up the phone.  And I said, What's a matter, man? And he said, That was my brother.  He wants to know why we're ordering so much.  And he said that we have to go pick up his brother, but we have to go all the way back to his apartment on the east side -- Theo Ferguson's apartment on the east side to meet his brother.

(Tr. 19-20.)

{¶ 5}   After Corporal Smith and Theo drove to Theo's apartment, appellant drove up in a mini van.  According to Corporal Smith:

> [Theo] said this is my brother.  I believe [appellant] kind of took the lead there and said the guy -- the supplier doesn't like to be kept waiting, so we needed to start going.  And

> [appellant] got in the back seat of my car, and Theo got in the front passenger's seat of the car.

(Tr. 21-22.)

{¶ 6} Corporal Smith testified that appellant was on the phone getting instructions from the supplier on where to go. Corporal Smith drove to a gas station on Georgesville Road, and, once there, both appellant and Theo pointed out a black Lexus and instructed Corporal Smith to follow it. They followed the Lexus into a subdivision where the Lexus parked "all the way in the back." (Tr. 26.) Once parked, Corporal Smith gave the money to Theo who gave the money to appellant who counted the money and put it in his pocket. Appellant then walked to and entered the Lexus. After "about a minute," appellant exited the Lexus and returned to Corporal Smith's vehicle and the Lexus drove away. (Tr. 28.) Appellant entered Corporal Smith's vehicle and handed him a bag containing suspected crack cocaine. Corporal Smith was asked what happened next, and he testified:

> I asked him -- I said -- I wanted to make sure it weighed out right, meaning I wasn't getting ripped off. He said the supplier is always right on point is what he told me. He said, You don't have to worry about him being light on the weight. And we weighed it out, and it came out on the digital scale with the bag and everything, it came out over an ounce, like 29 grams or something.

(Tr. 28-29.)

{¶ 7} Corporal Smith also weighed the crack cocaine back at his office after the transaction was over, and the weight with the bag was 29.1 grams. Corporal Smith testified that the lab results indicated the substance was "27.6 grams, found to contain cocaine base. Crack cocaine." (Tr. 34.)

{¶ 8} Amanda White, analyst at the Ohio Bureau of Criminal Identification and Investigation ("BCI"), conducted an analysis of the substance on February 6, 2013, approximately one and one-half years after the offense date. At this time, the substance weighed 23.1 grams. According to White, "if you take cocaine hydrochloride, or the powder form of cocaine, and you boil it in water with baking soda, which is sodium carbonate, then that will precipitate out, or form the free-base form, which is the crack

cocaine." (Tr. 86-87.) Because of this, when crack cocaine is created it normally contains some form of moisture. When asked to explain the difference in the weight, White testified, "[a]fter time, then the moisture will evaporate off and, typically, the weight will be less." (Tr. 87.)

{¶ 9} The jury returned a verdict of guilty finding that the amount of crack cocaine involved at the time of the offense was 27 or more grams. At sentencing, the trial court imposed a four-year term of incarceration, a driver's license suspension, and a mandatory $10,000 fine. Additionally, the trial court ordered restitution in the amount of $1,150 to be paid to the victim, the Franklin County Sheriff's Office Trust Fund.

## II. ASSIGNMENTS OF ERROR

{¶ 10} Appellant brings three assignments of error for our review:

> [I.] The trial court erred when it entered judgment against the defendant for a conviction of a first-degree felony when the evidence was insufficient to sustain a finding, beyond a reasonable doubt, that the substance weighed twenty-seven grams or more at the time of the offense.
>
> [II.] The trial court erred when it entered judgment against the defendant for a conviction of a first-degree felony when it was not established, by the manifest weight of the evidence and beyond a reasonable doubt, that the substance weighed twenty-seven grams or more at the time of the offense.
>
> [III.] The trial court erred when it ordered the defendant to pay restitution, in the amount of $1,150.00, to the Franklin County Sheriff's Department as restitution for the buy money used in the case.

## III. DISCUSSION

### A. First and Second Assignments of Error

{¶ 11} For purposes of discussion, appellant combined the first two assignments of error and we will do likewise. In these assigned errors, appellant challenges both the sufficiency and the weight of the evidence supporting his convictions.

{¶ 12} Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to support a verdict is a question of

law, not fact.  *Id.*  In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "  *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.  A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact.  *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 13} In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed, but whether, if believed, the evidence supports the conviction.  *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime").

{¶ 14} In contrast to assessing the sufficiency of the evidence, when presented with a manifest weight challenge, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).  An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' "  *Id.*, quoting *Martin* at 175.

{¶ 15} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses.  *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6.  However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe

their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 16} Appellant was convicted of trafficking in cocaine in violation of R.C. 2925.03, which prohibits a person from knowingly selling or offering to sell a controlled substance. Effective September 30, 2011, R.C. 2925.03 provides that if the amount of the drug involved equals or exceeds 27 grams but is less than 100 grams, the offense is a first-degree felony, and if the drug involved equals or exceeds 20 grams but is less than 27 grams, the offense is a second-degree felony.

{¶ 17} " 'Sale' includes delivery, barter, exchange, transfer, or gift, or offer thereof, and each transaction of those natures made by any person, whether as principal, proprietor, agent, servant, or employee." R.C. 2925.01(A) (incorporating definition found in R.C. 3719.01(AA)). "[F]or purposes of R.C. 2925.03(A), the phrase, 'offer to sell a controlled substance,' simply means to declare one's readiness or willingness to sell a controlled substance *or* to present a controlled substance for acceptance or rejection. Furthermore, the issue of whether a defendant has knowingly made an offer to sell a controlled substance in any given case must be determined by examining the totality of the circumstances, including 'the dialogue and course of conduct of the accused.' " (Emphasis sic.) *State v. Burton*, 2d Dist. No. 94-CA-13 (Mar. 31, 1995), quoting *State v. Patterson*, 69 Ohio St.2d 445, 447 (1982); *see also State v. Vaughn*, 5th Dist. No. 2011-COA-021, 2012-Ohio-316; *State v. Henton*, 121 Ohio App.3d 501, 510 (11th Dist.1997).

{¶ 18} Appellant makes two arguments that both challenge the evidence surrounding the weight of the drug: (1) the record lacks evidence establishing that, at the time of the offense, the actual weight of the drug equaled or exceeded 27 grams, and (2) he cannot be convicted of trafficking an amount equal to or exceeding 27 grams based on an offer to sell an ounce, or 28.3 grams, of cocaine because the record lacks evidence that he was aware of such an offer. According to appellant, there is no evidence that he made an offer to sell an ounce of crack cocaine because it was not appellant, but Theo, who offered to sell an ounce of cocaine to Corporal Smith. Appellant states he was neither present when the offer was made nor did he aid and abet in making the offer since he was not involved in this transaction until after the offer to sell an ounce was complete. In

other words, it is appellant's position that the offense, i.e., offering to sell an ounce of cocaine, had already been committed at the time he got involved in this transaction because Theo had already negotiated the deal.

{¶ 19} In support of his position that he cannot be convicted of trafficking in cocaine in an amount equal to or exceeding 27 grams under the theory that he offered to sell an ounce of cocaine, appellant relies primarily on *State v. Ospina*, 81 Ohio App.3d 644 (10th Dist.1992). In that case, the defendant argued his conviction for trafficking cocaine in an amount equal to or greater than 100 times the bulk amount, or 1,000 grams, was not supported by the manifest weight of the evidence because the actual amount of cocaine delivered by the defendant was 990.5 grams. The defendant also suggested an "offer to sell" theory was inapplicable because there was no evidence that the defendant himself negotiated the sale of "one kilo" of cocaine. *Id.* at 652.

{¶ 20} This court reversed the defendant's conviction and remanded the matter for resentencing for the sale of 990.5 grams of cocaine rather than the amount of 1,000 grams. This court did so, however, because there was insufficient evidence establishing that the defendant was aware of an offer to sell a "kilo" of cocaine as the defendant was shown only to have delivered an amount of 990.5 grams. In fact, the court went on to state, "[t]he result would be different if it were proved that [the defendant] had been aware of the offer to sell the requisite amount even if the amount actually delivered was less." *Id.* at 653.

{¶ 21} In contrast to the lack of evidence presented in *Ospina*, here, Corporal Smith testified that when he and Theo were waiting at a gas station near the pizza place, Theo was on the phone and appeared upset about something. When asked what was wrong, Corporal Smith testified that Theo stated his brother was on the phone and wanted to know why they were "ordering so much." (Tr. 19.) Corporal Smith also testified that Theo told him they would not make the sale at the pizza shop because "they didn't like to sell that amount of narcotics from the shop." (Tr. 27-28.) According to Corporal Smith, once appellant entered his car, he began taking driving directions from appellant because appellant was on the telephone getting directions from the supplier that was bringing the ounce of cocaine to them. Corporal Smith testified that at least one time during the trip "they said [the supplier] doesn't want to meet new people, and the fact that

he wouldn't let Theo middleman the transaction and had to have someone closer to him handle the transaction, it was obvious the supplier did not want to meet new people." (Tr. 27.) Once parked near the black Lexus, Corporal Smith testified that he handed Theo the money, who "just went through it really quick," and then Theo handed the money to appellant who "took his time, counted it, made sure it was all there, and he folded it up and put it in his pocket." (Tr. 28.) Appellant then exited Corporal Smith's car and entered the Lexus. After a minute or so, appellant got back into Corporal Smith's car and handed him a bag containing the suspected crack cocaine. When asked if there was any conversation between Corporal Smith and appellant, Corporal Smith testified that appellant said the "supplier is always right on point" and that he did not "have to worry about [the supplier] being light on the weight." (Tr. 28.) Nonetheless, they weighed it out "and it came out on the digital scale with the bag and everything, it came out over an ounce, like 29 grams or something." (Tr. 28-29.)

{¶ 22} Unlike *Ospina*, this record presents sufficient evidence to establish appellant was aware of the offer to sell an ounce, or 28.3 grams, of crack cocaine. Therefore, we reject appellant's assertion that there is insufficient evidence establishing that he was involved in an offer to sell an ounce of crack cocaine such that he cannot be convicted of trafficking an amount equal to or exceeding 27 grams but less than 100 grams.

{¶ 23} Appellant also argues his legal culpability in this case can only be based on the actual weight of the substance that he transported from the Lexus to Corporal Smith and that "[t]he problem herein is that there was no evidence presented as to what the substance weighed when the defendant committed the offense on August 23, 2011." (Appellant's Brief, 21.) Though we need not address this argument given our conclusion above, we nonetheless find no merit to this argument.

{¶ 24} The evidence presented at trial establishes that Corporal Smith weighed the substance at the time of the transaction, and, including the baggie, the substance weighed "like 29 grams or something." (Tr. 29.) Appellant attacks this evidence as being improper and inaccurate. However, the jury was aware of this, as Corporal Smith testified on cross-examination that the weight from his digital scale was not an "official" measurement and Corporal Smith agreed that it could be inaccurate. (Tr. 63.) After returning to his office,

Corporal Smith testified he put the substance on a scale, took a picture of it, and conducted a field test. Corporal Smith testified that, including the baggie, the scale in the photograph reads 29.1 grams. After photographing and weighing the substance in the office, it was sealed and sent to BCI for testing and weighing.

{¶ 25} According to BCI's October 12, 2011 laboratory report, the crack cocaine weighed 27.3 grams, and according to the re-weigh done on February 6, 2013, the crack cocaine weighed 23.1 grams. White testified to the process involved in making crack cocaine and explained that the moisture from the manufacturing process will evaporate, and, therefore, crack cocaine typically weighs less over time. The evidence that the crack cocaine weighed 27.3 grams when initially tested is sufficient evidence that appellant sold an amount of crack cocaine equal to or exceeding 27 grams. The fact that it weighed less 17 months later does not change the sufficiency of this evidence, nor does it render a conviction for trafficking an amount equal to or exceeding 27 grams against the manifest weight of the evidence. *State v. Jones*, 7th Dist. No. 06 MA 17, 2007-Ohio-7200 (where the jury was advised that water evaporates from crack cocaine over time, evidence that crack cocaine weighed 10.31 grams when first tested, as opposed to 7.783 grams five months later, was sufficient to establish the defendant sold an amount equal to or exceeding 10 grams); *State v. Hodge*, 2d Dist. No. 23964, 2011-Ohio-633 (when determining the weight of crack cocaine, the trier of fact is not required to disregard the weight of moisture contained therein).

{¶ 26} Despite this explanation, appellant suggests the crack cocaine "could" have weighed less than 27 grams at the time of the offense. Because there was testimony that the moisture from crack cocaine's manufacturing process will evaporate and result in the drug weighing less over time, appellant asserts we can assume the weight of the substance could change depending on the humidity level in the air. Appellant also asserts we can "assume that most people live in air conditioned dwellings these days, particularly someone who drives a Lexus," such that "if the substance came from an air-conditioned dwelling and was transported in an air-conditioned Lexus, the substance would have been exposed to a reduced humidity level * * * and could have absorbed moisture after it was taken from the Lexus and delivered to the deputy." (Appellant's Brief, 27.) The record,

however, is devoid of any evidence either suggesting this phenomenon or supporting the string of appellant's assumptions.

{¶ 27} Upon review of all the evidence, we conclude that appellant's conviction for trafficking in cocaine, a first-degree felony, in violation of R.C. 2925.03, is neither based upon insufficient evidence nor is against the manifest weight of the evidence. Accordingly, we overrule appellant's first and second assignments of error.

### B.  Third Assignment of Error

{¶ 28} In his third assignment of error, appellant asserts the trial court erred when it ordered him to pay restitution in the amount of $1,150 to the Franklin County Sheriff's Office Trust Fund for the buy money used in the case.

{¶ 29} The state concedes that, unless expressly agreed otherwise, law enforcement agencies typically are not entitled to restitution for funds spent on the performance of their investigative duties.  *State v. Williams*, 6th Dist. No. S-13-007, 2013-Ohio-4838 (plain error to order restitution to law enforcement agency for drug buy money because such agency is not a victim to which restitution is authorized); *State v. Moody*, 2d Dist. No. 2011-CA-29, 2011-Ohio-2234 (restitution to law enforcement agency for funds expended not appropriate where there was no evidence the defendant expressly consented to the same as part of the plea agreement); *see also State v. Justice*, 5th Dist. No. 09-CA-66, 2010-Ohio-4781; *State v. Montgomery*, 4th Dist. No. 07CA858, 2008-Ohio-4753; *State v. Stewart*, 3d Dist. No. 16-08-11, 2008-Ohio-5823; *State v. Pietrangelo*, 11th Dist. No. 2003-L-125, 2005-Ohio-1686.

{¶ 30} Accordingly, we sustain appellant's third assignment of error.

## IV.  CONCLUSION

{¶ 31} Based on the foregoing, appellant's first and second assignments of error are overruled, and appellant's third assignment of error is sustained.  The judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this matter is remanded to that court to vacate the $1,150 order of restitution.

*Judgment affirmed in part, reversed in part;*
*cause remanded with instructions.*

TYACK and BROWN, JJ., concur.

_____